**COALITION FOR GOVERNMENT PROCUREMENT, et al.,**
**Plaintiffs,**

**v.**

**FEDERAL PRISON INDUSTRIES,**
**et al., Defendants.**

**No. 1:99–CV–919.**

United States District Court,
W.D. Michigan,
Southern Division.

Aug. 8, 2001.

J. Terrance Dillon, Myers, Nelson, Dillon & Shierk, PLLC, Grand Rapids, MI, Stephen M. Ryan, Manatt, Phelps & Phillips, LLP, Washington, DC, for Coalition for Government Procurement, Unknown Part(y)(IES), named as "John Does 1–3" on complaint, pltfs.

Charles R. Gross, U.S. Attorney's Office, Western District of Michigan, Grand Rapids, MI, for Federal Prison Industries, Steve B. Schwalb, Chief Operating Officer, Federal Prison Industries, Federal Prison Industries Board of Directors, Janet Reno, Attorney General of the United States, defts.

## *OPINION*

ROBERT HOLMES BELL, Chief Judge.

In this federal question case Plaintiffs, Coalition for Government Procurement, *et al.,* ("the Coalition"), allege that Defendants, Federal Prison Industries, *et al.,* ("FPI"), have overstepped their statutory authority and violated the Administrative Procedures Act by illegally producing and selling office furniture. Before the Court are cross-motions for summary judgment pursuant to FED. R. CIV. P. 56. For the reasons discussed below, the Court grants summary judgment in favor of Defendants on all nine counts of the suit.

### *Facts*

The Coalition is a trade association whose membership consists of over 300 private sector manufacturers, distributors, and dealers whose businesses are affected by Federal Prison Industries. Office furniture manufacturers Herman Miller, Inc., Haworth, Inc., and Knoll, Inc., are also Plaintiffs in this action.

Defendant Federal Prison Industries ("FPI") is a government corporation established by Congress in 1934 to provide work programs for federal prison inmates. Congress intended FPI "to provide work

programs and training opportunities for inmates confined within the Federal Bureau of Prisons system." 28 C.F.R. § 345.11(a). Federal agencies are required to purchase FPI products unless they procure a waiver from FPI.[1] Under 18 U.S.C. § 4122, FPI may not "significantly expand" production of a product until it obtains approval from FPI's Boards of Directors. Before the Board may approve a request for a significant expansion, 18 U.S.C. § 4122 requires a written analysis of the impact of the increase on industry, an announcement of the proposal to private vendors, and an invitation for comments.

The Coalition has brought nine counts against FPI. Counts 1–7 arise out of Plaintiffs' allegations that FPI engaged in illegal production expansions of office furniture between 1991 and 1995. Counts 1 through 3 allege unauthorized significant increases in systems furniture production, seating furniture production, and case goods production, respectively. Count 4 challenges the propriety of the Board's retroactive approval of those increases. Count 5 alleges that the 1996 Board approval of future expansion of production is illegitimate. Count 6 challenges the legality of the Significant Expansion Guidelines themselves. Count 7 asserts that Plaintiffs should be compensated for their loss of business due to FPI's expansions because those expansions amounted to a regulatory taking under the Fifth Amendment. Count 8 alleges that FPI's continued practice of "pass-through" sales[2] to fill orders of government agencies are illegal. Count 9 alleges that FPI is illegally forcing private sector businesses that provide office furniture to federal government subcontractors in federal "turn-key" construction projects to purchase FPI furniture.

### Analysis

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue concerning a material fact is genuine if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Under Rule 56 the court must view the evidence in a light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment is proper if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to the party's case for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. See *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party to come forward with evidence showing that

---

**1.** Federal Acquisition Regulations 8.602, 8.605.

**2.** "Pass-through" refers to FPI's occasional practice of buying office furniture from a private vendor and passing it on to a government agency when FPI fails to meet a manufacturing deadline to supply FPI-manufactured furniture.

there is a genuine issue of material fact that must go to trial. *See Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment as a matter of law. *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548.

■ The Coalition seeks judicial review of federal agency action under the authority of the Administrative Procedure Act. In reviewing the merits of the counts raised in the complaint, the Court employs a narrow standard of review. The Court may "set aside the agency determination only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Sierra Club v. Slater,* 120 F.3d 623, 632 (6th Cir.1997), *citing Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 375, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Communities, Inc. v. Busey,* 956 F.2d 619, 622 (6th Cir.1992). *See also Mercer v. United States Medical Ctr. for Fed. Prisoners,* 312 F.Supp. 1077, 1079 (W.D.Mo.1970) ("So long as Federal Prison Industries, Inc., and its board of directors do not administer the authority conferred by [Congress] in a manner which is arbitrary or capricious, Courts may not properly interfere with their performance of their delegated functions.").

From its inception, FPI was granted broad discretionary authority to carry out its mission: "It shall ... have power to do all things it is authorized to do by [Pub.L. No. 73–461], and all things incident to or necessary and proper in the exercise of its functions. Exec. Order No. 6917 (Dec. 11, 1934)."[3] "Federal Prison Industries shall determine in what manner and to what extent industrial operations shall be car-

ried on in Federal penal and correction institutions for production of commodities for consumption in such institutions or for sale to the departments or agencies of the United States ...." 18 U.S.C. § 4122(a).

This grant of broad discretion is not unlimited. Several restrictions were placed upon FPI. The most important is that no single industry should bear an "undue burden" as a result of the prison work program:

[FPI] shall have power to determine in what manner and to what extent industrial operations shall be carried on in the several penal and correctional institutions of the United States and shall, so far as practicable, so diversify prison industrial operations that no single private industry shall be forced to bear an undue burden of competition with the products of the prison workshops.[4]

In addition, although FPI is authorized to sell its products to the federal government, it may not sell to the public in competition with private enterprise. 18 U.S.C. §§ 4121–4122. The Board of FPI has the difficult task of balancing several seemingly incongruous public policy goals: It must employ "the greatest number of inmates ... as is reasonably possible," "diversify, so far as practicable, prison industrial operations," and operate the federal prison factories such that "no single private industry shall be forced to bear an undue burden of competition ... and to reduce to a minimum competition with private industry or free labor." 18 U.S.C. § 4122(b)(1).

Within these parameters, day-to-day decisions as to fulfilling its mandate are within the discretion of FPI. FPI has delegated authority to make these day-to-day decisions to operate individual factories to

**3.** *See Defendants' Motion for Summary Judgment,* Exh. 1.

**4.** Exec. Order No. 6917 (Dec. 11, 1934).

Associate Wardens who oversee FPI operations at those institutions where FPI maintains manufacturing facilities. 28 C.F.R. § 345.11(b).

Congress also established a Board to oversee FPI. The Board consists of "six directors, appointed by the President to serve at the will of the President without compensation." 18 U.S.C. § 4121. One of the six directors represents the Secretary of Defense, one represents the Attorney General, and the remaining four represent the private sector. *Id.* Decisions to "produce a new product or to significantly expand the production of an existing product shall be made by the board of directors of the corporation." 18 U.S.C. § 4122(b)(4). When proposing a significant increase to the Board, FPI is required to prepare a report evaluating the analysis of the increase on industry as well as provide private vendors with notice and an opportunity to comment on the proposed increases. 18 U.S.C. § 4122(b)(4)(A—C).

The Board has promulgated guidelines to help determine when an increase in production is significant. The guidelines pertaining to this case were in effect from 1989 to 1997. They were a two-tiered structure. The first tier acted as a trigger for application of the second tier. Only when production increases met the bar of the second tier were increases deemed significant.

A review of whether an increase was substantial was triggered by the following conditions:

(1) The specific product will be produced at a new factory and not offset by a corresponding reduction in production at another location; or

(2) The specific product will be produced at an existing factory or factories,

and will be accompanied by at least a 10% increase in capacity resulting from expanding any of the following three inputs of production: a) plant size, b) equipment capacity, c) inmate employment.[5]

Meeting either of the above criteria alone is insufficient to satisfy the conditions of deeming an increase significant. Meeting the trigger conditions merely required FPI to do an analysis of market share. The production increase would only then be deemed significant if FPI's federal market share for a product line changed in accordance with the following scale:

| Market Share | Allowable Market Share Increase |
|---|---|
| 0%—5% | Any increase, provided FPI's share does not exceed 5%. |
| 5%—10% | 3%, provided FPI's share does not exceed 10% |
| 10%—15% | 2%, provided FPI's share does not exceed 15% |
| 15%—20% | 1.5%, provided FPI's share does not exceed 20% |
| 20%—25% | 1%, provided FPI's share does not exceed 25% |
| Over 25% | Any increase in market share would be deemed significant.[6] |

A wooden adherence to the promulgated guidelines would fail to take into account the year-to-year fluctuations experienced in normal market conditions. In recognizing this fact the Board also provided in the guidelines that "[i]n determining the base production level, the prior three years of production will be reviewed, to ensure that usual and/or abnormal fluctuations are taken into account and normalized." *Significant Expansion of Production for an Existing Product, Commerce Bus. Daily,* Is. PSA–025 (Dec. 31, 1990), *Admin. Rec.* at 513.

---

5. *Significant Expansion of Production or an Existing Product, Commerce Bus. Daily,* Is. PSA–025 (Dec. 31, 1990), *Admin. Rec.* at 513.

6. *Id.*

■ An unauthorized significant expansion only occurs when, without prior approval of the Board, FPI increases both its production capacity by a certain amount and its market share exceeds one of the threshold levels in the guidelines. An occurrence of one of these factors is insufficient to be declared a significant expansion. The reasoning behind the dual requirement is so that only market expansions that occur as a result of expanded production capacity will be regarded as true market expansions. That is, it prevents an insignificant expansion from inadvertently being labeled a significant expansion due to the contracting of the market alone or due to an increase in production that does not result in a greater market share.

*Counts 1–4: Failure to Comply with Administrative Procedures.*

■ Counts 1 through 3 allege unauthorized significant increases in systems furniture production, seating furniture production, and case goods production, respectively, from FY 1990 to FY 1996. Defendants counter that Plaintiffs' complaint on these three counts is denied by the doctrine of waiver, that there were only two unauthorized increases, and that these two unauthorized increases were legitimately approved in a subsequent decision by the Board. The Court agrees with Defendants' arguments.

"It is a well-established principle that courts will not consider issues not presented before an administrative proceeding at the appropriate time." *Cellnet Communi-*

cations, Inc. v. FCC, 149 F.3d 429, 442 (6th Cir.1998) (ruling that Plaintiff's claim was barred because it had not followed the EPA's administrative review procedures); *Marathon Oil Co. v. United States*, 807 F.2d 759, 767–68 (9th Cir.1986); *Michigan Dept. of Environmental Quality v. Browner*, 230 F.3d 181, 183 n. 1 (6th Cir.2000) (holding that those issues petitioners failed to raise during the comment period were waived for purposes of appellate review).

Procedural objections like those Plaintiffs bring in this case are precisely the type of issues appropriately raised before the Board during its comment period, and thus subject to waiver if not raised. *Cellnet Communications*, 149 F.3d at 442 (citing *City of Brookings Municipal Tel. Co. v. FCC*, 822 F.2d 1153, 1163 (D.C.Cir. 1987)) (declining to review petitioner's claims that APA notice was inadequate).

The Board of FPI provided an opportunity for Plaintiffs and other interested parties to raise the issue of procedural violations during three separate meetings of the Board during 1996. Plaintiffs were not only aware of the proceedings,[7] but were aware of the issues to be raised at the hearings,[8] and fully participated in the hearings.[9]

■ Even if Plaintiffs had not waived their claims by not raising them at the administrative hearings in 1996, these claims fail. First, of the four unauthorized significant increases alleged by Plaintiffs only one is actually significant under the guidelines. Second, the procedural failures of FPI concerning that increase,

---

7. *See, e.g., Impact Study of FPI's Proposed Expansion of Office Seating* (March, 1996), Admin. Rec. at 551–52, 553; *Letters from members of the Coalition to Board of FPI*, Admin. Rec. at 608–612.

8. *See, e.g., Letter from Brad Miller, Manager of Government Affairs for the Business and Industrial Furniture Manufacturer's Association*

to Steve Schwalb of FPI, (July 8, 1996), Admin. Rec. at 640.

9. *See, e.g., Visitor Sign–In Sheet for Public Comment Period of the July 23, 1999 Meeting of the Board of FPI*, Admin. Rec. at 646–49; *Transcript of July 23, 1996, Meeting of the Board of FPI*, Admin. Rec. at 650–724.

along with a second unauthorized significant increase admitted by FPI, were cured by the Board's February 1996 retroactive approval of those increases.

Plaintiffs allege that there were four unauthorized significant increases between 1990 and 1996: In office case goods in FY 1992; in systems furniture in FY 1994; and in office seating in FY 1992 and 1993.

Of these, only the office seating increase in 1992 was an unauthorized expansion. As discussed above, to be an unauthorized expansion three criteria must be met: First, the triggering factors must occur; second, the market share must be greater than allowed by the guidelines; and third, the Board must not have approved the increase.

The office case goods increase in FY 1992 was not a significant increase. Between FY 1991 and 1992 there was an inmate employment increase of over 10% (the trigger), and an increase in market share of 2.3%. These increases would normally be considered a significant increase. Plaintiffs fail to consider, however, that the guidelines also require that "the prior three years of production will be reviewed, to ensure that usual and/or abnormal fluctuations are taken into account and normalized." *Admin. Rec.* at 513. Inmate employment was 1,243 in 1990, 1,066 in 1991, and 1,358 in 1992. By 1995, inmate employment was 1,462. Taking the prior years into account, the Court finds that the spike in 1992 in inmate employment was a result of a low point of employment in 1991 rather than a significant increase by itself.

Neither is the systems furniture increase in FY 1994 significant. It is true that FPI's increase in market share from 9.6% to 14.3% was over the guidelines limit, even taking into account the prior years' market shares. The trigger prong, however, is not satisfied. Plaintiffs rely upon the fact that FPI was planning on increased capacity in a new factory at the Federal Corrections Facility in Coleman to satisfy the trigger requirement. That factory was not activated until February of 1996. No offsetting reduction in capacity, therefore, was necessary in FY 1994, and consequently the trigger prong was not met. When the Coleman factory was activated, FPI was under the increased production levels approved by the Board on February 6, 1996. Therefore, there was no unauthorized increase in systems furniture.

Plaintiffs' allegation of an unauthorized increase in office seating in 1993 based on increased inmate employment and the opening of two new seating factories also fails. The trigger mechanism was tripped by a projected inmate employment increase of over 10%, from 888 in 1992 to 983 in 1993. The projected sales for FY 1993, however, were projected to be $34.1 million, a $14 million decrease from the previous year. Because the guidelines are required only for "proposed production increases," [10] there was no requirement for FPI to either perform an analysis or request permission from the Board for the proposed changes. Even if FPI had been required to perform a market analysis, the projected market share would have been less than required by the guidelines because of the decrease in projected production.

FPI did open two new seating factories in 1993. These two factories had sales of $3 million in FY 1993. At the same time, there was a decrease in seating production at five other factories totaling $4.9 million. *See Admin. Rec.,* at 588. Because there was no actual increase in production, there could not have been an unauthorized increase. Moreover, had FPI been required to perform the market share analysis, the

---

**10.** *See Admin. Rec.,* at 0513, 1510.

projected market share would have been less than required by the guidelines because of the decrease in projected production.

■ There were, however, two unauthorized substantial increases under the guidelines. These occurred in office seating in FY 1992, as Plaintiffs allege, as well as in FY 1991. In 1991, inmate employment increased by over 10%, from 661 to 739, thus triggering a market analysis. FPI's market share increased from 14.6% to 15.3%, thus violating the guideline that when within that bracket market share cannot increase past 15% without causing a significant increase. In 1992, inmate employment again increased by over 10%, from 739 to 888, thus triggering a market analysis. Between FY 1992 and FY 1993 FPI's market share of the federal office seating market increased from 15.3% to 19.2%, an increase of 3.9%. Because the guidelines dictate that any increase over 1.5% is significant, the increase between FY 1992 and 1993 is a substantial increase. An analysis of the previous three years indicates that the increases were not aberrations but part of an upward curve in production and market share.

Defendants assert that these two increases were retroactively approved by the FPI Board in February 1996. Plaintiffs, in Count 4, challenges the propriety, legality, and efficacy of the Board's subsequent approval of those increases. In 1996 the Board recognized that on two prior occasions, in 1991 and 1992, FPI significantly expanded its seating production without receiving prior approval. The Board observed that the increases "occurred due in part to ambiguities in the current definition of significant expansion, and in part to difficulties with monitoring expansion." *See Defendants' Motion for Summary Judgment,* at 26. The Board then decided to evaluate the past increases by the standard of whether FPI obtained more than a "reasonable share" of the federal market for office seating, and whether the increase had an undue impact on a single industry. The Board concluded that due to the dramatic increase in private industry sales, neither standard was violated.

Defendants concede that the approvals should have been done in advance. But Defendants argue that summary judgment in its favor is still merited for several reasons. First, Plaintiffs had notice of the public hearing at which the increases were retroactively approved. Second, the Board acted in accordance with its governing statute, 18 U.S.C. 4122(b)(1)-(2), requiring it to focus on private industry impact. Third, the Board acted in accordance with the broad grant of authority given it by Congress to oversee the actions of FPI. Exec. Order 6917 (Dec. 11, 1934) grants the Board the "power to do all things it is authorized to do by [Pub.L. No. 71–461], and all things incident to or necessary and proper in the exercise of its functions." Here, the decision of the Board could be considered necessary and proper in its supervision of FPI.

Plaintiffs rely heavily upon *Quarters Furniture Manufacturers Association v. Federal Prison Industries, et al.,* No. 95 Civ. 2237 (D.D.C. Aug. 28, 1998)[11] as support for their contention that the Board's retroactive approval of the unauthorized significant increases was illegitimate. Plaintiffs' reliance is misplaced.

The facts in *Quarters* are very similar to those in the present case. The plaintiff, a dorm and living quarters furniture manufacturing trade association, alleged that FPI had violated the Administrative Procedure Act by, *inter alia,* failing to get prior Board approval for significant in-

---

11. *See* Exhibit 15.

creases under the same guidelines at issue in the present case.

The Federal District Court for the District of Columbia concluded that the Board's subsequent approval of the prior significant increases could not stand because private industry was not adequately apprised, as part of the procedures leading up to the administrative hearing, that the Board would take up the question of ratifying those past increases. *See Quarters* at 17–18 (Plaintiffs' Exhibit 15). In support of its decision the court noted that letters sent by the Board to provide notice and solicit comment concerning the 1996 meeting "solicited information and comments on future production levels, not the prior production levels." *Id.*, at 17. The *Quarters* court speculated that "the agency may not have made the same decision had it received timely comments." *Id.*, at 18.

This Court adopts the reasoning of *Quarters* but comes to a different finding in the present case because the record indicates that Plaintiffs were given adequate notice that the Board would consider approving the past significant increases in office seating production. The office seating impact study made available to the public in advance of the Board's 1996 decision clearly identified the expansion problems experience in 1991 and 1992 with office seating. For both 1991 and 1992, the report states that increases in production should have triggered "an analysis of market share" to determine the necessity of initiating the guidelines process. *Admin. Rec.* at 551–52. Anyone familiar with the guidelines would have known that if the market share exceeded those guidelines, FPI would need the approval of the Board. Moreover, the report specifically stated that the Board would consider retroactive approval of the significant increases in office seating:

> In light of the fact that FPI failed to initiate the industry involvement guidelines process in response to its expansion of production in FY 1992, FPI now asks the Board of Directors to ratify the Corporation's expansion of office seating during that time, taking into consideration the relevant data for that point in time.[12]

FPI sent Plaintiffs a copy of that report on May 23, 1996. *Admin. Rec.*, at 603–04, 607. The meeting at which the Board proposed to retroactively approve the significant increases occurred on July 23, 1996. The record indicates that Plaintiffs were aware or should have been aware that the Board had proposed such action, had provided notice of that action, and that it had invited comment on that action.

On July 8, 1996, for example, Brad Miller, Manager of Government Affairs for the Business and Industrial Furniture Manufacturer's Association,[13] wrote in a letter requesting an opportunity to appear at the administrative hearing:

> FPI staff admits that the guidelines and hearing process may have been necessary in 1991 and 1992 when FPI's volume increased 41% ($9.3M in '91) and 50% ($16M in '92). In an effort to address that "oversight," *FPI staff asks the Board to retroactively ratify the expansion that took place at that time.*[14]

Mr. Miller subsequently appeared at the July administrative hearing and was al-

---

12. *Impact Study of FPI's Proposed Expansion of Office Seating* (March, 1996), *Admin. Rec.*, at 553.

13. Plaintiffs Herman Miller, Inc., Haworth, Inc., and Knoll, Inc. are also members of the Business and Industrial Furniture Manufacturer's Association.

14. *Admin. Rec.*, at 640 (emphasis added).

lowed to comment on the proposals before the Board. *Admin. Rec.*, at 646.

Plaintiffs had proper notice of the Board's intent to consider retroactive approval of the significant increases in office seating production, as well as an opportunity to comment at that administrative hearing. Therefore the Board was within its authority to consider and decided the issue and in so doing did not violate the Administrative Procedures Act.

Defendants also assert the doctrine of laches as an affirmative defense of the Board's actions at the July 23, 1996, hearing. Because the grounds discussed *supra* are sufficient to grant summary judgment in favor of Defendants, the Court does not reach the issue of laches.

*Count 5: The Board of FPI's Approval of Future Sales.*

■ Count 5 challenges the 1996 Board approval of future expansion of production. Plaintiffs assert that the Board's approval of future increases must be vacated because it was based on inaccurate and misleading information. *See Plaintiffs' Brief for Summary Judgment*, at 33. The argument is insufficient to avoid a grant of summary judgment in favor of Defendants. The decisions of FPI's Board are entitled to a presumption of regularity. *Citizens to Preserve Overton Park, Inc., v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Nevertheless, agency action must be set aside if the action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Volpe*, 401 U.S. at 413–14, 91 S.Ct. 814; 5 U.S.C. §§ 706(2)(A)-(D). The arbitrary and capricious standard is the most deferential and least demanding form of judicial review of administrative action. *See Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir.1989), *cert. denied*, 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 288 (1990).

■ When applying this standard, the Court's review is limited to determining whether the agency action was rational. *See Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir.1988). When it is possible to offer a reasoned explanation, based on the evidence before the agency, for a particular outcome, "that outcome is not arbitrary or capricious." *Davis*, 887 F.2d at 693.

When reviewing an agency decision the Court is constrained to look at only the evidence that was before the Board at the time the decision was made. Here, Plaintiffs offer a different data collection methods and interpretation that they say would have led the Board to a different decision regarding future market expansion. The issue before the Court, however, is not which set of data is more accurate, but whether the Board made a reasonable decision based on the evidence before it at the time. The Court finds that the market data before the Board at the time it made its decision concerning future production increases provides the basis for a reasoned explanation. The Board's actions, therefore, were neither arbitrary nor capricious.

■ Plaintiffs also argue that the Board's decision on future increases failed to consider whether the then current production levels during 1996 were even legal. The record does not support Plaintiffs' contention. The Board itself recognized that certain increases had occurred without prior Board approval, and carefully considered those increases and the context in which they occurred before deciding that those increases did not violate FPI's governing statutes. *See Admin. Rec.*, at 733–34. An agency decision is "arbitrary and capricious if the agency ... entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (internal citations omitted). Here,

it is impossible to conclude from the evidence that the Board failed "entirely" to consider the problem of whether past increases exceeded the mandate of FPI because it specifically addressed those increases in its 1996 hearing.

*Count 6: The Validity of FPI's Guidelines.*

■ Count 6 challenges the legality of the Significant Expansion Guidelines themselves. FPI's governing statutes mandate that all significant increases be approved in advance. Plaintiffs argue that if the Guidelines for Significant Increases allow approval of past advances, they must be in violation of the governing statutes.

■ The issue is moot. The guidelines of which Plaintiffs complain were substantially revised in 1997. The guidelines were changed so that under the definition of a significant expansion of an existing product the triggering mechanism would rely upon FPI's actual sales rather than FPI's capacity for manufacturing. *See Admin. Rec.*, at 3201. Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies. *See DeFunis v. Odegaard,* 416 U.S. 312, 316, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed. *See Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975).

■ There would be no case or controversy if by issuing a decision the Court would not affect the rights of the litigants. To satisfy the Article III case or controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision. *See Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Be-

cause the guidelines out of which Plaintiffs' complaint arose have been substantially altered, this represents a classic example of a moot issue.

Even if the issue were not moot, Count 6 would still fail. The question is not whether the guidelines in effect at that time allowed past approval, but whether the guidelines furthered FPI's mandate to improve the prospects of prison inmates through gainful employment without unduly burdening any one industry. As discussed *supra* under Count 4, the governing statute grants the Board broad discretionary authority to take all necessary and proper action in their role as supervisors of FPI. Here, the Board saw as a necessary and proper action the approval of prior increases because those increases did not lead to an undue burden upon the private sector office furniture manufacturers. Whether or not the guidelines allowed such a retroactive approval is simply not in conflict with the governing statute.

*Count 7: Just Compensation for Takings under the Fifth Amendment.*

■ Plaintiffs assert that they should be compensated for an alleged loss of future office furniture sales in excess of $450 million due to FPI's expansions. Plaintiffs maintain that those expansions amounted to a regulatory taking under the Fifth Amendment. Plaintiffs assert that FPI took federal office furniture market share that properly belonged to Plaintiffs by exercising its statutory and regulatory authority. In determining whether there has been a regulatory taking the Court examines the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action. *See Eastern Enterprises v. Apfel,* 524 U.S. 498, 499, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998).

■ The Court concludes that the increases in federal office furniture did not result in onerous and unreasonable restrictions on the use of Plaintiffs' property as to constitute a Fifth Amendment taking. The Board was authorized by 18 U.S.C. §§ 4121–4122 to determine what was an appropriate market share in light of FPI's authorizing statute. It is well settled that lawful regulatory action does not constitute a compensable taking merely because the result is to diminish the value of private property, reduce profits, or prevent the most beneficial use of such property. *See, e.g., Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); *Bowles v. Willingham,* 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944).

■ A loss of market share is not a direct appropriation of private property requiring compensation under Fifth Amendment takings jurisprudence. Where there has been no direct appropriation of property by governmental agencies, consequential damages resulting from the exercise of lawful regulations are not compensable takings within the purview of the Fifth Amendment. *Basin, Inc. v. Federal Energy Admin.,* 552 F.2d 931 (Em.App.), *cert. denied,* 434 U.S. 821, 98 S.Ct. 64, 54 L.Ed.2d 78 (1977); *Condor Operating Co. v. Sawhill,* 514 F.2d 351 (Em.App.), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975); *Mosca v. United States,* 189 Ct.Cl. 283, 417 F.2d 1382 (1969), *cert. denied,* 399 U.S. 911, 90 S.Ct. 2197, 26 L.Ed.2d 565 (1970). Plaintiffs, therefore, are entitled to no relief on their Count 7 grounds.

*Count 8: Legality of FPI's Pass–Through Practice.*

■ In the course of its manufacturing process, FPI on occasion has failed to meet deadlines for product delivery. FPI has used a "pass-through" practice to meet the deadline. If the product is one for which FPI is in a manufacturing relationship with a private manufacturer, FPI may purchase the product directly from the private manufacturer and resell it to the federal agency for timely delivery. The pass-through practice provides no direct benefit to FPI. No prison labor is employed, and FPI loses that sale to the private sector. FPI has no written policy governing pass-through sales. In 1998 2.4 %, or $2.6 million, of FPI's systems furniture sales were pass-through sales.

■ Plaintiffs allege that FPI is using its mandatory source preferences to "launder Federal procurement contracts to its private sector partners" by using the pass-through practice. *See Plaintiffs' Brief for Summary Judgment,* at 57. Plaintiffs further alleges that FPI's governing statute does not allow it to sell non-prison-labor-produced goods, and that it is abusing its mandatory source preference. The Court finds that Plaintiffs lack standing because they cannot show an injury-in-fact resulting from FPI's pass-through practice. Even if Plaintiffs could show an injury in fact, this count would fail because the practice is a reasonable application of those regulations and statutes governing the operations of FPI.

■ A necessary condition for standing in a federal case is that the Plaintiffs be able to demonstrate an injury-in-fact. *See Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The party invoking federal jurisdiction must "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors v.. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *see also Valley Forge*

*Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471–72, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Even a threatened injury, however, must be "distinct and palpable" and "likely to be redressed if the requested relief is granted." *Valley Forge,* 454 U.S. at 475, 102 S.Ct. 752. In *Valley Forge,* the Court concluded that the aggrieved party failed to identify any personal injury suffered by the plaintiff beyond what could be produced merely as the result of a government policy with which they disagreed. *Valley Forge,* 454 U.S. at 485, 102 S.Ct. 752. Such a tenuous injury is not sufficient to confer standing under Article III. *Id.* Plaintiff must show that he "has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action." *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 688, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

Plaintiffs have been unable to show anything but an "abstract concern" because of Defendants practice of pass-through sales. *See Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 37–38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Nor would Plaintiffs enjoy any relief were the pass-through practices to end. Plaintiffs contend that its injuries are concrete because they are denied the opportunity to make those sales. Under this reasoning, however, the Court would have to overturn FPI's Congressional mandate and halt FPI's entire manufacturing process because every sale "harms" Plaintiffs' opportunity to make sales to the federal government. It is clear that Plaintiffs' purported loss of sales is a result of Congressional mandate, not the occasional pass-through sales practices of FPI.

Furthermore, if FPI is denied the use of private sector furniture to fill orders the deadlines of which FPI fails to meet, those orders will not go to Plaintiffs. Rather, those orders will simply be filled by FPI at a later date, at the inconvenience of the federal government agency to whom the furniture has been promised. Because Plaintiffs fail to show that they would be harmed by the actions of the agency, they do not have standing to bring Count 8.

■ Even if Plaintiffs could demonstrate that their tenuous claim to harm confers standing, this count would fail because FPI's practice of pass-through sales are within the broad scope of discretion granted to FPI and it's Board under its governing statute. FPI's authority to "determine in what manner and to what extent industrial operations will take place in federal prisons" is set forth in 18 U.S.C. § 4122(a). In determining whether an agency's construction of a statutory provision is proper, it is not necessary to find that the agency's interpretation is the only possible or plausible construction, or even the same as the court would have reached. *Chevron v. Natural Res. Def. Council,* 467 U.S. 837, 843 n. 11, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). An agency's interpretation is owed considerable deference by a reviewing court, provided it is consistent with a governing regulation. *Thomas Jefferson University v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).

The question here is not whether the statute specifically allows the practice of pass-through sales, but whether that practice is consistent with the agency's governing regulation. The Court finds that it is. Far from being a practice in violation of FPI's mandate, it is a prudent business practice that in the long run allows FPI to complete its mandate from Congress.

Courts have recognized the broad discretion granted to FPI under § 4122 as a bar to litigants dissatisfied with FPI's

business decisions. In *Heale Manufacturing Co. v. Abell*, Case No. 87–C–1157 (E.D.Wisc.1987), several wire harness manufactures sued FPI claiming that FPI was monopolizing the wire harness industry. The court ruled that the broad discretion granted by statute to FPI barred plaintiff's efforts for relief. In the present case the Court must defer to the same broad discretion granted by Congress in the organic statute, and therefore cannot grant Plaintiffs' request for a halt to Defendants' practice of pass-through sales.

*Count 9: Legality of FPI's Forcing Contractors to Purchase FPI Products.*

 As discussed above, Congress has declared that no federal agency may purchase furniture from a private vendor without first obtaining a waiver from FPI. On occasion, however, a federal agency will contract with a private sector contractor for a turn-key facility, including the installation of office furniture before the agency occupies the facility. FPI has on those occasions exercised discretion as to whether it will require the contractor to purchase that furniture from FPI or whether it will waive its right to supply the agency with furniture.

Plaintiffs argue that by requiring the private contractor to purchase FPI furniture, FPI is violating its governing statute by selling to the private sector. Plaintiffs' claim fails, first, because they do not have standing to bring Count 9. As the Court discusses above under Count 8, Plaintiffs must show an actual or threatened harm beyond an imagined possibility of harm in order to have standing. Here, none of the Plaintiffs are able to allege any kind of personal injury-in-fact.

 Plaintiffs' claim under Count 9 also fails because forcing government contractors to buy furniture from FPI is a practice well within the bounds of FPI's governing statute. FPI's authority to "determine in what manner and to what extent industrial operations will take place in federal prisons" is set forth in 18 U.S.C. § 4122(a). In determining whether an agency's construction of a statutory provision is proper, it is not necessary to find that the agency's interpretation is the only possible or plausible construction, or even the same as the court would have reached. *Chevron v. Natural Res. Def. Council,* 467 U.S. 837, 843 n. 11, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). An agency's interpretation is owed considerable deference by a reviewing court, provided it is consistent with a governing regulation. *Thomas Jefferson University v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).

The question here is not whether the statute specifically allows the practice of pass-through sales, but whether that practice is consistent with the agency's governing regulation. The Court finds that it is. Far from being a practice in violation of FPI's mandate, it is a prudent business practice that in the long run allows FPI to complete its mandate from Congress. Congress has declared that federal agencies are required to purchase FPI products unless they procure a waiver from FPI. *See Federal Acquisition Regulations* 8 .602, 8.605. As Defendants and common sense demonstrate, the actual purchaser is not the contractor, but the federal agency for whom the contractor is constructing a facility. To allow a federal agency to escape the legal requirement of obtaining a waiver or purchasing furniture from FPI simply by purchasing furniture produced in the private sector using a subcontractor as a middle-man would subvert the will of Congress. Moreover, when FPI engages in this practice, it is not selling goods to the private sector because title for those goods passes directly to the federal agency for whom the facility is being constructed. *See Defendants' Motion for Summary Judgment,* (Docket # 60), Exh. 2, at 0011. Therefore, FPI's practice of requiring pri-

vate contractors to purchase FPI furniture as part of a turn-key facility construction does not violate FPI's governing statutes.

### Conclusion

Plaintiffs' case is essentially a policy disagreement with decisions arising out of the delegation of authority to the Board of FPI by Congress. It may be, as suggested in the record, that FPI amounts to an "economic burden to law-abiding citizens who are denied employment and have their tax dollars expended for over-priced inferior products." *See Admin. Rec.*, at 609. That burden, however, must be balanced against the meliorative policy, also cited numerous times in the record by the foes of FPI, of providing productive work for the idle hands in the federal prison system. The floor of the United States Congress, not the Court chambers, is the proper place to determine the balance between mutually exclusive public policies. Were this Court to grant the relief requested by Plaintiffs, it would trespass across those lines of authority set up by the framers in the Constitution. Because of those boundaries, the federal courts simply cannot serve as succor for every perceived injustice inflicted by the policy-making arm of the legislative branch of the government.

Accordingly, an order consistent with this opinion will be entered.

### ORDER

In accordance with the opinion entered on this date, the Court hereby **ORDERS** that:

Defendants' motion for summary judgment (Docket # 60) is **GRANTED**, Plaintiffs' motion for summary judgment (Docket # 74) is **DENIED**, and the case is **DISMISSED** in its entirety.